## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

PNC BANK, N.A.,                    )
                                )
        Plaintiff,                    )
                                )
        v.                    )     Case No. _____
                                )
STEFAN RAINER,                    )
                                )
        Defendant.                    )

## VERIFIED COMPLAINT

COMES NOW Plaintiff PNC Bank, N.A. ("PNC" or "Plaintiff"), by and through undersigned counsel, and files the following Verified Complaint against Defendant Stefan Rainer ("Rainer"). In support thereof, PNC states as follows:

## PARTIES

1.      PNC is incorporated in Delaware and maintains a principal place of business in Pittsburgh, Pennsylvania.   PNC is a party to a Restricted Stock Award Agreement (the "Agreement") with Rainer. The matters complained of herein arise from Rainer's breach of this Agreement.

2.      At all material times hereto, PNC maintained an address of 1 PNC Plaza, 249 5th Avenue, Pittsburgh, Pennsylvania 15222-2707.

3.      Rainer is a resident of Alabama with a home address of 155 Paul Revere Drive, Madison, Alabama 35758.

## NATURE OF THE CASE

4.      This case arises out of Rainer's breach of his contractual and other legal obligations owed to PNC by misappropriating PNC's confidential information and unlawfully soliciting PNC's customers.

5.      Prior to his resignation on May 22, 2025, Rainer was employed as a Senior Vice President and Wealth Advisor by PNC Investments, a wholly-owned broker-dealer subsidiary of PNC.  In this position, Rainer was responsible for providing financial advisory services for a number of PNC's customers.

6.      During his employment, Rainer received significant consideration from PNC in the form of stock grants in exchange for his promise that, as relevant here, for a period of one (1) year following the termination of his employment, he would not solicit, call on, due business with, or actively interfere with PNC's or any subsidiary's relationship with, or attempt to divert or entice away any PNC customer.

7.      In complete disregard of his contractual obligations, Rainer pursued an unlawful scheme to misappropriate PNC's confidential and proprietary business information and trade secrets and to divert PNC's valuable customer relationships and goodwill for his benefit and the benefit of his new employer Wells Fargo, a direct competitor of PNC.

8.      Rainer's breaching and unlawful conduct has continued, without abatement, since Rainer's resignation.  Within days of his May 22, 2025 departure, Rainer successfully solicited clients for whom PNC managed over $23 million to depart to Wells Fargo for nearly identical services.

9.      As a result of Rainer's unlawful conduct, PNC has suffered, and will continue to suffer, significant damages, as well as the loss of customer relationships, customer good will, and confidential and trade secret business information.

## JURISDICTION AND VENUE

10.      Jurisdiction in this Court is proper pursuant to 28 U.S.C. § 1332 because the citizenship of the parties is diverse and the amount in controversy, exclusive of interest and costs, exceeds $75,000.

11.      For diversity jurisdiction purposes, PNC is a Delaware corporation, and Rainer is a citizen of Alabama, and therefore there is complete diversity of citizenship between the parties.

12.      The amount in controversy is in excess of $75,000 in that Rainer has caused or, if not enjoined, will cause, PNC to suffer damages in excess of $75,000.

13.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) & (3) because the events giving rise to the claims in this action occurred in substantial part in this District (where Rainer accepted the Agreement and transacted business) and threatened harm has occurred and will continue to occur here if Rainer is not enjoined.

14.      Venue is also proper in this District because Rainer stipulated in the Agreement that all disputes or claims relating to the subject matter complained of herein shall be brought exclusively in this District, and he expressly waived any right to challenge jurisdiction or venue in this District.

## ALLEGATIONS COMMON ALL COUNTS

A. Rainer Signs Restricted Stock Unit Agreement with PNC.

15.    Rainer accepted employment with PNC in 2016. Rainer most recently worked for PNC Investments as a Senior Vice President and Wealth Advisor, in which role he provided financial advisory services to PNC customers.

16.    By virtue of his role, Rainer had access to certain of PNC's confidential and proprietary information, as well as PNC's trade secrets, including but not limited to customer contact information, customer account information, and pricing information.

17.    During each year of his employment with PNC, Rainer entered into a Restricted Stock Award Agreement under which Rainer received restricted stock awards in exchange for making certain promises, including a promise not to solicit or do business with current or former customers of PNC for a certain period of time following his termination from PNC.

18.    Most recently, on February 14, 2025, Rainer and PNC entered into the Agreement, pursuant to which Rainer received restricted stock awards totaling 197 shares of PNC stock under the terms of PNC's long-term incentive plan. A true and correct copy of the Agreement is attached hereto as Exhibit A.

19.    By executing this Agreement, Rainer agreed that PNC could seek relief in this jurisdiction in the event that Rainer breached his obligations to PNC identified therein.

20.    As consideration for these stock awards, Rainer promised in the Agreement not to solicit or do business with current or former customers of PNC as follows:

(a)    Non-Solicitation; No-Hire. You agree to comply with the provisions of this Section 1(a) during the period of your employment with PNC and the 12-month period following your Termination Date, regardless of the reason for such termination of employment, as follows:

      i. *Non-Solicitation*. You will not, directly or indirectly, either for your own benefit or purpose or for the benefit or purpose of any Person other than PNC, solicit, call on, do business with, or actively interfere with PNC's relationship with, or attempt to divert or entice away, any Person that you should reasonably know (A) is a customer of PNC for which PNC provides any services as of your Termination Date, or (B) was a customer of PNC for which PNC provided any services at any time during the 12 months preceding your Termination Date, or (C) was, as of your Termination Date, considering retention of PNC to provide any services.

(Agreement, Appendix A, § 1(a)(i)).

21.    Pursuant to the Agreement, Rainer further agreed as follows:

(b) <u>Confidentiality</u>.   During your employment with PNC and thereafter regardless of the reason for termination of such employment, you will not disclose or use in any way any confidential business or technical information or trade secret acquired in the course of such employment, all of which is the exclusive and valuable property of PNC whether or not conceived of or prepared by you, other than (i) information generally known in PNC's industry or acquired from public sources, (ii) as required in the course of employment by PNC, (iii) as required by any court, supervisory authority, administrative agency or applicable law, or (iv) with the prior written consent of PNC. Nothing in this Agreement, including this Section 1(b), is intended to limit you from affirmatively reporting to, communicating directly with, or providing information and documents — with the exception of information or documents that are subject to a legal or other applicable privilege—to any governmental entity, regulator, or self-regulatory organization (including the Securities and Exchange Commission or Commodity Futures Trading Commission) regarding possible violations of law or regulation. You further understand and agree that you are not required to contact or receive consent from PNC before engaging in such communications with any such authorities. However, if you receive a court order or valid and effective subpoena, interrogatory, or similar legal process not involving a governmental agency or regulatory body that requires disclosure of any confidential business or technical information or trade secret, before making any disclosure you must promptly notify PNC in writing of the order or other legal process.

(Agreement, Appendix A, § 1(b)).

B.  <u>Rainer Impermissibly Handles PNC's Confidential Customer Information</u>

22.    PNC and its subsidiaries have attained, and can only maintain, their success and present position in the industry by preserving the confidentiality of PNC proprietary business

information and trade secrets, including but not limited to business plans and strategies, customer contact information, and other customer account information. This information constitutes protectable, confidential information of PNC as made clear in the Agreement.

23.     PNC and its subsidiaries have undertaken significant measures to protect and maintain the confidential nature of their business and customer information. In addition to certain physical and electronic security measures undertaken by PNC and its subsidiaries, for many years PNC has arranged for key employees to execute agreements requiring these employees to maintain as confidential and not disclose such information to third parties.

24.     Indeed, Rainer executed the Agreement, whereby he promised not to disclose or use any confidential business or technical information or trade secrets acquired during the course of his employment with a PNC subsidiary, except on behalf of PNC or its subsidiary.

25.     Notwithstanding these significant protective measures undertaken by PNC, Rainer misappropriated confidential information of PNC to unlawfully compete through his new employer, Wells Fargo.

26.     On March 12, 2025, Rainer sent an email ("March 12 Email") from his PNC email address to his external personal email address. A true and correct copy of the March 12 Email is attached as Exhibit B.

27.     This email included an attached spreadsheet that contained, among other things, PNC confidential and proprietary customer lists and information, including but not limited to customer names and account information.

28.     Subsequently, on March 13, 2025, PNC instituted an email block on Rainer's personal email address following Rainer's unauthorized email to his personal email address which contained PNC's confidential and proprietary information.

29.     On March 27, 2025, PNC placed Rainer on "investigative policy," and conducted an investigation into Rainer's above-described conduct.

30.     Following PNC's investigation, PNC concluded that Rainer had violated PNC policy by sending PNC's confidential and proprietary information to an external personal email address.

31.     This was not the first time that Rainer had been placed on investigative policy. Rainer had previously been investigated for sending PNC's confidential and proprietary information—including sensitive customer information—to an external personal email address in 2020 and 2021.

32.     On April 9, 2025, Rainer signed an Acknowledgement whereby he purported to acknowledge that "all copies of the misdirected information have been securely deleted from systems, returned to PNC, or securely destroyed and that misdirected information has not been used/disclosed and will not be further used/disclosed for any purpose." A true and correct copy of the Acknowledgment is attached as Exhibit C.

C.  Rainer's March 12 Email Reflects Rainer's Intent to Solicit PNC Clients in Violation of the Agreement.

33.     Prior to his resignation from PNC, Rainer began soliciting PNC customers to transfer their assets away from PNC and to Wells Fargo, documenting his solicitation efforts on the Excel workbook entitled "Most Important ETFs."

34.     The March 12 Email contained three Excel workbooks, each of which contained confidential and proprietary information concerning PNC customers.

35.     One of the workbooks attached to the March 12 Email was entitled "Most Important ETFs," which contained some non-confidential and non-proprietary industry information.

36.    However, embedded within the Most Important ETFs workbook were a number of sheets which contained confidential, proprietary, and/or trade secret information belonging to PNC, including a sheet entitled "Customer Assignment." *See* Exhibit D.

37.    The Customer Assignment sheet contains a list of more than 250 PNC customers and certain account information, which is confidential, proprietary, and/or trade secret information belonging to PNC.

38.    Upon information and belief, Rainer intentionally embedded the Customer Assignment sheet within the otherwise innocuous Most Important ETFs workbook to conceal the fact that the March 12 Email contained PNC's confidential and proprietary information.

39.    Column K of the Customer Assignment sheet, titled "Call on 3/4-3/5-2025" contains a number of columns documenting Rainer's recent contacts with the listed customers, with notations indicating whether Rainer had successfully contacted the customers.

40.    Column U of the Customer Assignment sheet is titled "Y/M/N."

41.    Upon information and belief, Rainer used Column U to track which clients he was soliciting, or would solicit, to transfer assets away from PNC in anticipation of Rainer's move to Wells Fargo.

42.    Column AC of the Customer Assignment sheet is entitled "CONFIRM MOVE Y/N."

43.    Upon information and belief, Rainer used Column AC to track communications with PNC clients and their willingness to transfer assets away from PNC in anticipation of Rainer's move to Wells Fargo.

D.    Rainer Departs PNC and Solicits PNC Customers to Transfer Assets to Wells Fargo.

44.    On May 22, 2025, Rainer resigned from his position at PNC.

45.    Shortly thereafter, Rainer began working as a financial advisor for Wells Fargo.

46.    Within days of his resignation from PNC, PNC began to see several customer accounts previously managed by Rainer initiate transfers to Wells Fargo.

47.    Since Rainer's resignation on May 22, 2025, at least fifteen (15) PNC customers have initiated transfers of their assets to Wells Fargo, amounting to over $23 million in assets under management and counting.

48.    By way of example, until recently Customer A had an account with PNC Investments, previously managed by Rainer, that had over $2 million in assets under management. Customer A is reflected in row 63 of the Customer Assignment sheet. *See* Ex. D, Row 63.

49.    Column K of the Customer Assignment sheet, titled "Call on 3/4-3/5-2025," includes the notation "Yes, 3/4/2024" for Customer A.  Column AC, titled "CONFIRM MOVE YES/NO" includes the notation "YES' for Customer A.

50.    On May 28, 2025, less than a week after Rainer's resignation from PNC, Customer A transferred their account to Wells Fargo.

51.    Upon information and belief, as indicated by the notations in the Customer Assignment sheet that Rainer used to track his improper solicitation efforts, Rainer pre-solicited Customer A during his employment with PNC, then successfully solicited Customer A to transfer their account to Wells Fargo following Rainer's resignation from PNC, in breach of his obligations under the Agreement and other applicable law.

52.    Upon information and belief, and in light of Rainer's ongoing solicitation of PNC customers, Rainer is still in possession of the confidential and proprietary PNC materials that Rainer emailed to his personal email address via the March 12 Email, including the Excel

spreadsheets, despite signing the April 9, 2025 acknowledgment in which he promised to destroy all such materials.

53.     Rainer continues to breach the Agreement and other applicable law by soliciting PNC customers and using PNC's confidential, proprietary, and trade secret information.

## COUNT I: BREACH OF CONTRACT

54.     PNC incorporates by reference paragraphs 1-53 of its Verified Complaint as though fully set forth herein.

55.     A valid contract existed between PNC and Rainer. *See* Agreement.

56.     The Agreement was, and is, supported by sufficient consideration as evidenced by PNC's granting of stock awards to Rainer.

57.     Despite PNC's performance and willingness to perform in compliance with the Agreement, Rainer breached the Agreement.

58.     Rainer agreed that for a period of twelve (12) months following his termination of employment from PNC, he would not directly or indirectly "solicit, call on, do business with, or actively interfere with PNC's relationship with" any individuals whom he reasonably knew to be PNC customers. Agreement, Appendix A, § 1(a)(i).

59.     Rainer also agreed that he would not disclose, duplicate, or use PNC's confidential and/or proprietary information (including trade secrets) either during his employment or any time thereafter. Agreement, Appendix A, § 1(b).

60.     Rainer breached the Agreement by, among other things, (1) soliciting, calling on, doing business with, and otherwise interfering with PNC's relationship with customers he reasonably knew to be PNC customers, by encouraging certain clients to transfer their assets from

PNC to Wells Fargo; (2) upon information and belief, sharing PNC's confidential and proprietary information with Wells Fargo and/or using it on Wells Fargo's behalf.

61.     While the full extent of Rainer's actions and the damages caused thereby are presently unknown, Rainer's breach of the Agreement has caused and will continue to cause damages to PNC, including without limitation jeopardy to and/or loss of PNC's existing and future business relationships with its customers, lost profits, loss of customer contacts, unfair competition, loss of confidential business information, and loss of competitive advantage.

62.     Accordingly, injunctive and monetary relief should be issued forthwith to enjoin Rainer's conduct, hold Rainer accountable for the promises and agreements he made, and award relief to PNC to remedy Rainer's multiple breaches of the Agreement.

## COUNT II: BREACH OF DUTY OF LOYALTY

63.     PNC incorporates by reference paragraphs 1-62 of its Verified Complaint as though fully set forth herein.

64.     Rainer owed a duty of loyalty to PNC while employed there.

65.     Rainer violated his duty of loyalty to PNC when he pre-solicited PNC's customers to transfer their accounts to Wells Fargo when Rainer moved there.

66.     Rainer also violated his duty of loyalty to PNC by, upon information and belief, sharing PNC's confidential and proprietary information with Wells Fargo and/or using it on Wells Fargo's behalf.

67.     While the full extent of Rainer's actions and the damages caused thereby are presently unknown, Rainer's breach of his duty of loyalty has caused and will continue to cause damages to PNC, including without limitation jeopardy to and/or loss of PNC's existing and future business relationships and contracts with its customers, lost profits, loss of goodwill, loss of

customer contacts, unfair competition, loss of confidential business information, loss of referral sources, damage to or loss of PNC's reputation, and loss of competitive advantage.

68.     Accordingly, injunctive and other relief should be issued forthwith to enjoin Rainer's conduct, hold Rainer accountable for the promises and agreements he made, and award relief to PNC to remedy Rainer's breach of the Agreement.

## COUNT III: VIOLATION OF PENNSYLVANIA UNIFORM TRADE SECRETS ACT

69.     PNC incorporates by reference paragraphs 1-68 of its Verified Complaint as though fully set forth herein.

70.     The Pennsylvania Uniform Trade Secrets Act, 12 Pa. C.S.A. §§ 5301-5308 ("PAUTSA"), provides that an owner of a trade secret may bring a civil action to prevent any actual or threatened misappropriation of a trade secret.

71.     Rainer signed the Agreement in which he agreed that he would not disclose, duplicate, or use PNC's confidential and/or proprietary information (including trade secrets) either during his employment or any time thereafter. Agreement, Appendix A, § 1(b).

72.     As set forth above, Rainer misappropriated and may continue to misappropriate PNC's trade secrets in violation of PAUTSA.

73.     Accordingly, PNC brings this claim to prevent the actual or threatened misappropriation of its trade secrets by Rainer, as specifically provided under PAUTSA.

74.     PNC takes reasonable steps to maintain the secrecy of its trade secrets, such as restricting access to information to only certain employees and requiring logins and passwords on its information technology systems.

75.    PNC requests a temporary restraining order, preliminary injunction, and permanent injunction under 12 Pa. C.S.A. § 5303 to prevent any actual or threatened misappropriation of its trade secrets.

76.    PNC also requests an award against Rainer to the maximum extent permitted under 12 Pa. C.S.A. § 5304, including exemplary damages.

## COUNT V: INJUNCTIVE RELIEF

77.    PNC incorporates by reference paragraphs 1-76 of its Verified Complaint as though fully set forth herein.

78.    Rainer has breached, and continues to breach, the Agreement with PNC, including without limitation by soliciting, calling on, and doing business with PNC customers of whom he was reasonably aware, within twelve (12) months of the termination of his employment with PNC, and by using PNC's trade secrets and other confidential and proprietary information for his employment at Wells Fargo, all of which directly violate the Agreement.

79.    PNC cannot fully and adequately determine the extent of the effect of Rainer's actions at this time, which remain ongoing and unlawful.

80.    Allowing Rainer to violate his contractual agreement, applicable law, or both, has resulted and will continue to result in irreparable harm to PNC, including without limitation loss of customers, loss of good will, loss of customer contacts, unfair competition, loss of confidential business information, loss of trade secrets, loss of reputation, loss of contracts with customers, and loss of competitive advantage.

81.    PNC will therefore suffer irreparable injury and harm from Rainer's violations should injunctive relief not issue in favor of PNC and against Rainer.

82. At this time, it is impossible for PNC to calculate the damages that have resulted, and will continue to result, from Rainer's violations. It is equally impossible to calculate the resulting damages to PNC's loss of customers, loss of good will, loss of customer contacts, unfair competition, loss of confidential business information, loss of trade secrets, loss of reputation, loss of contracts with customers, and loss of competitive advantage.

83. Any harm that Rainer may allegedly incur as a result of the requested relief is overwhelmingly outweighed by the harm to PNC should the relief not issue, a situation that Rainer unilaterally created himself.

84. Injunctive relief is not against the public interest; it would merely enforce Rainer's contractual obligations and obligations under the law.

85. The requested injunctive relief, as detailed in PNC's prayer for relief below, must be granted to avoid any immediate irreparable injury, loss, or damage to PNC.

86. The requested injunctive relief serves to preserve the status quo pending a determination of the controversy between the parties.

87. PNC has no adequate remedy at law concerning its claims set forth in this Count.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff PNC Bank, N.A., prays for judgment against Defendant Rainer as follows:

(a) Monetary damages in an amount unknown at this time and to be proven at trial as a result of Rainer's breach of contract, breach of the duty of loyalty and violation(s) of the Pennsylvania Uniform Trade Secrets Act;

(b) Entering a temporary restraining order, preliminary injunction, and permanent injunction enjoining and restraining Rainer:

(i)      During the period of twelve (12) months following the date of termination of Rainer's employment with PNC, from soliciting, calling on, doing business with, or actively interfering with PNC's relationship with, or attempting to divert or entice away, any Person that Rainer should reasonably know (A) is a customer of PNC for which PNC provides any services as of Rainer's Termination Date, or (B) was a customer of PNC for which PNC provided any services at any time during the 12 months preceding Rainer's Termination Date, or (C) was, as of Rainer's Termination Date, considering retention of PNC to provide any services;

(ii)     With respect to confidential and proprietary information (including customer information and trade secrets) of PNC, from disclosing, using, or providing any such documents, information, or trade secrets, to anyone, except for the return of such documents, information, or trade secrets directly to PNC or its attorneys;

(c)    Award PNC its attorneys' fees, costs and expenses incurred or expended;

(d)    Award pre- and post-judgment interest at the maximum rate permitted by law; and

(e)    Such other and further relief as the Court deems just and proper.

Dated:  June 5, 2025                   Respectfully submitted,

BURNS WHITE LLC

By:  /s/ *Lyle D. Washowich*
Lyle D. Washowich Pa. I.D. No. 84348
Meghan M. Matscherz Pa. I.D. No. 325088
Burns White Center
48 26th Street
Pittsburgh, Pennsylvania 15222
(412) 995-3004 (phone)
(412) 995-3300 (facsimile)
ldwashowich@burnswhite.com
mmmatscherz@burnswhite.com

DOWD BENNETT LLP

Jeffrey R. Hoops (application for admission *pro hac vice* forthcoming)
Tanner W. Bone (application for admission *pro hac vice* forthcoming)
7676 Forsyth Blvd., Suite 1900
St. Louis, Missouri 63105
(314) 889-7300 (phone)
(314) 863-2111 (facsimile)
jhoops@dowdbennett.com
tbone@dowdbennett.com

*Attorneys for Plaintiff PNC Bank, N.A.*

## VERIFICATION

I, M. Brett Giles, declare:

1.  I am a Senior Vice President – Regional Sales Manager with PNC Investments LLC, a wholly-owned broker-dealer subsidiary of PNC Bank, N.A.

2.  I verify that the foregoing Verified Complaint for and on behalf of PNC Bank, N.A. was duly prepared under my direction with the assistance of counsel; that the facts stated therein have been assembled by authorized employees and counsel for PNC Bank, N.A.; and that the allegations therein are true and correct to the best of my knowledge, information, and belief.

3.  I declare under penalty of perjury that the foregoing is true and correct.

*M. Brett Giles – SVP-RSM*
_____

Executed in _Tyler, Tx_____ on _05 June_____, 2025.