# Exhibit A



**The PNC Financial Services Group, Inc.**
**Cash-Payable Restricted Share Units**
**Information Related to FICA Taxation**

Nonqualified deferred compensation, such as your Cash-Payable Restricted Share Units ("CPRSUs"), is subject to special taxation rules. For many recipients of a CPRSUs award, both income and FICA taxes will be due at the time the CPRSUs award is paid. However, the CPRSUs are subject to special timing rules that accelerate the FICA taxation of the CPRSUs for recipients in certain circumstances. Specifically, recipients who either (1) are "retirement eligible" when the CPRSUs are awarded, or who become "retirement eligible" before the third anniversary of the designated marker date (regardless of actual employment status with PNC) or (2) terminate employment with PNC as a result of a displacement termination and sign an effective release of claims in connection with such displacement termination.

This notice will explain what FICA taxes are, when your CPRSUs would become subject to accelerated FICA taxes, and how PNC intends to collect accelerated FICA taxes due. Keep in mind that if the FICA taxation of your CPRSUs is accelerated under these special timing rules, the CPRSUs will not be subject to FICA taxes again when they are paid to you.

**What are FICA taxes?**
Federal Insurance Contributions Act taxes, which are commonly known as "FICA" taxes, are generally imposed on all wages paid to you by PNC.  FICA taxes are made up of two separate taxes: The first is Old-Age Survivors and Disability Insurance, often referred to as "Social Security" or "OASDI." The second is Hospital Insurance, often referred to as "Medicare" or "HI."  You and PNC must each pay a Social Security tax of 6.2% on wages up to the applicable statutory wage base, which is $176,100 for 2025, and a Medicare tax of 1.45% on wages up to an income threshold of $200,000 (single)/$250,000 (married filing jointly) and 2.35% on wages over that income threshold. For purposes of withholding, PNC will treat each employee as a single filer. *PNC is not permitted to consider any employee's individual filing status when withholding the Medicare tax.*

**When are your CPRSUs subject to FICA taxes?**
Under the FICA tax rules, your CPRSUs will be subject to FICA tax when you satisfy the service requirements for the CPRSUs.  In general, the service requirements are met on the first to occur of the following events:

1)   The third anniversary of the designated marker date; or
2)   The date that you are "retirement eligible" (which may be as early as the date of grant) or
3)   The date that your employment with PNC is terminated due to a qualifying displacement.

*Retirement Eligible* - you are generally considered "retirement eligible" on the first date on which you have both attained at least age fifty-five (55) and completed five (5) years of service.[1]

*Qualifying Displacement* - you will generally meet the criteria for a displacement termination if you meet the eligibility requirements of PNC's displacement benefits plan and sign an effective release of claims in connection with your displacement termination.

*Acceleration of FICA Taxation.*  If you first satisfy the service requirement for your CPRSUs under either (2) or (3) above, the FICA taxation of your CPRSUs will accelerate and become due before your CPRSUs are paid to you (and before any income taxes are withheld).  If you first satisfy the

---

[1] A year of service is determined in the same manner as the determination of a year of vesting service under the terms of The PNC Financial Services Group, Inc. Pension Plan.



service requirement for your CPRSUs under (1) above, FICA taxation does <u>not</u> accelerate and your FICA taxes will be due at the same time they are paid to you (i.e., the same time income taxes are also withheld.)

<u>*Terms of Award Agreement Remain in Effect*</u>. Please note that although service requirements may be satisfied prior to payment of your CPRSUs, CPRSUs are not distributed until the third anniversary of the designated marker date and you will remain subject to the terms and conditions of the CPRSUs award, including clawback policies and forfeiture if either you engage in "detrimental conduct" (as defined in your CPRSUs award agreement) or your employment terminates for "cause" (as defined in the plan document) before the third anniversary of the designated marker date. Please see your CPRSUs award agreement for more details regarding the service requirements related to the CPRSUs award.

### How will PNC collect the FICA taxes due?

*Collection via Payroll.* If you meet the service requirement before the third anniversary of the designated marker date, under the FICA tax rules, all your outstanding CPRSUs (including any outstanding CPRSUs under prior CPRSU awards, to the extent not previously taxed) become subject to FICA tax even though you have not received the payment relating to the award(s). As a result, PNC will be required to withhold the portion of the FICA taxes that you owe from other cash compensation, such as regular payroll wages or cash bonus amounts.

*Collection via Personal Check.* If you are inactive and not receiving pay, or you terminate employment before PNC has collected all of the FICA taxes that you owe (or as otherwise determined by PNC), you will be required to pay PNC directly (e.g., by personal check) for the FICA taxes owed depending on the date on which the service conditions are satisfied.

PNC may select the timing - within certain limitations and not later than the beginning part of the next calendar year - for the FICA taxation of your CPRSUs, with the result that such FICA tax date could be later than the date on which you have first satisfied the service requirements for your CPRSUs. See below for more information:

*Payment Timing if Retirement Eligible*
If your CPRSUs are subject to FICA taxation because you are or become retirement eligible in a given year, your FICA taxes will be determined on one of two FICA tax dates in the fourth quarter of that year:

    (1)   If you satisfy the service requirement on or before October 31 of a given year, your FICA taxes will be determined as of October 31, and such amounts will be withheld in one or more pays beginning with the first pay of November, or

    (2)   If you satisfy the service requirement between November 1 and December 31 of a given year, your FICA taxes will be determined as of the date you satisfy the requirement and such amounts will be withheld beginning with the first pay after you satisfy the service requirement. If there are not enough pays remaining in the year to cover your tax obligation, you will be asked to submit a personal check to PNC to cover your outstanding tax obligation. You will receive written notice if you are required to pay the FICA tax directly via check.

*Payment Timing Upon Qualifying Displacement*
If your CPRSUs are subject to FICA taxation due to the occurrence of a qualifying displacement, you will generally be taxed in four substantially equal portions from four displacement payments. PNC will notify you in advance of the date on which your FICA taxes will be determined and the date(s) that the deduction(s) will occur if this applies to you. You will receive written notice if you are required to pay any portion of the FICA tax directly via check.



**What happens to the FICA taxes I paid if I am subsequently required to forfeit the right to receive RSUs, for example, due to a violation of PNC's detrimental conduct and clawback policies?**

If you are required to forfeit the right to previously FICA-taxed RSUs, you may be entitled to a refund of these taxes from the IRS. In these circumstances, you may need to file a claim for a refund directly with the IRS because PNC will not repay you or file a claim for refund with the IRS on your behalf. Please contact your personal tax advisor about whether you are entitled to a refund of FICA taxes you paid on RSUs that you subsequently forfeited. Information concerning how to file a claim for refund of FICA taxes with the IRS can be found in the Instructions to IRS Form 843 (excess Social Security tax and Medicare tax), available at: https://www.irs.gov/instructions/i843, and in the Instructions to IRS Form 8959 (excess Additional Medicare tax), available at: https://www.irs.gov/instructions/i8959. Please note that in general a claim for refund must be filed with the IRS within three years of the date of overpayment.



**THE PNC FINANCIAL SERVICES GROUP, INC.**
**2016 INCENTIVE AWARD PLAN**
**\* \* \***
**CASH-PAYABLE RESTRICTED SHARE UNITS AWARD AGREEMENT**

This Agreement, which includes the attached appendices (this "Agreement") sets forth the terms and conditions of your restricted share unit award made pursuant to The PNC Financial Services Group, Inc. 2016 Incentive Award Plan and any sub-plans thereto. Appendix A to this Agreement sets forth additional terms and conditions of the Award, including restrictive covenant provisions. Appendix B to this Agreement sets forth certain definitions applicable to this Agreement generally. The Addendums following Appendix B set forth terms specific to California Employees and Washington Employees (as defined in the Addendums). Capitalized terms not otherwise defined in the body of this Agreement have the meaning ascribed to such terms in the Plan or Appendix B.

The Corporation and the Grantee named below (referenced in this Agreement as "you" or "your") agree as follows:

Subject to your timely acceptance of this Agreement (as described in Section A below), the Corporation grants to you the Award set forth below, subject to the terms and conditions of the Plan and this Agreement.

| A. | GRANT AND ACCEPTANCE OF RSUs |
|---|---|
| **GRANTEE:** | STEFAN  RAINER |
| **GRANT DATE:** | 02/14/2025 |
| **DESIGNATED MARKER DATE:** | March 7, 2025 |
| **AWARD:** | 197  Cash-payable Restricted Share Units representing a right to receive the cash value of one Share (the "RSUs") and related Dividend Equivalents. |
| **AWARD ACCEPTANCE; AWARD EFFECTIVE DATE:** | You must accept this Award by delivering an executed unaltered copy of this Agreement to the Corporation within 30 days of your receipt of this Agreement.  Upon such execution and delivery of this Agreement by both you and the Corporation, this Agreement is effective as of the Grant Date (the "Award Effective Date").  If you do not properly accept this Award, the Corporation may, |



in its sole discretion, cancel the Award at any time thereafter.

| **B.** | | **VESTING REQUIREMENTS** |
|---|---|---|
| **B.1** | **SERVICE-BASED VESTING REQUIREMENTS:** | 100% of the Award will vest and become payable on the 3rd anniversary of the Designated Marker Date (the "<u>Scheduled Vesting Date</u>"), provided you remain continuously employed by PNC through and including the date immediately prior to such date (except as otherwise provided in this Agreement) and in compliance with the terms and conditions of this Agreement. |

**B.2**    **EFFECT OF TERMINATION OF EMPLOYMENT (OR A CHANGE OF CONTROL) ON VESTING REQUIREMENTS**

| | | |
|---|---|---|
| **TREATMENT UPON RETIREMENT:** | | Notwithstanding anything to the contrary in this Agreement, if your employment with PNC is terminated due to your Retirement, and not for Cause (as determined by a PNC Designated Person), then the vesting requirements of the Award will be satisfied as of your Termination Date, but the Award will not become payable until the Scheduled Vesting Date(s), subject to your continued compliance with the terms and conditions of this Agreement. |
| **TREATMENT UPON TERMINATION BY REASON OF DISABILITY:** | | Notwithstanding anything to the contrary in this Agreement, if your employment with PNC is terminated by PNC due to your Disability, and not for Cause (as determined by a PNC Designated Person), then the vesting requirements of the Award will be satisfied as of your Termination Date, but the Award will not become payable until the Scheduled Vesting Date(s), subject to your continued compliance with the terms and conditions of this Agreement. |
| **TREATMENT UPON DEATH:** | | Notwithstanding anything to the contrary in this Agreement, if your employment with PNC ceases by reason of your death, or if you die after a termination of employment with PNC due to Disability or Retirement but prior to any Scheduled Vesting Date(s), then any outstanding portion of your Award will become vested and payable as of the date of your death. |



| | |
|---|---|
| **TREATMENT UPON AN ANTICIPATORY TERMINATION:** | Notwithstanding anything to the contrary in this Agreement, if your termination of employment with PNC is an Anticipatory Termination, then the vesting requirements of the Award will be satisfied as of the Termination Date, but the Award will not become payable until the Scheduled Vesting Date(s), subject to your continued compliance with the terms and conditions of this Agreement. |
| **TREATMENT UPON A DISPLACEMENT BENEFIT PLAN TERMINATION:** | Notwithstanding anything to the contrary in this Agreement, if your termination of employment with PNC is a Displacement Benefit Plan Termination, then the service-based vesting requirements of the Award will be satisfied as of the Termination Date or, if later, the date a Release becomes effective and irrevocable, but the Award will not become payable until the Scheduled Vesting Date, subject to your continued compliance with the terms and conditions of this Agreement. |
| **TREATMENT UPON A DIVESTITURE:** | Notwithstanding anything to the contrary in this Agreement, if your termination of employment with PNC is a Divestiture Termination, the treatment of any unvested portion of the Award will be determined by the terms of the applicable acquisition or outsourcing agreement, or as otherwise determined by the Committee or a PNC Designated Person. |
| **TREATMENT UPON A CHANGE OF CONTROL:** | Notwithstanding anything to the contrary in this Agreement, if you have been continuously employed by PNC until the date immediately prior to a Change of Control, or if your employment with PNC is terminated by PNC prior to a Change of Control by reason of Retirement or Disability or an Anticipatory Termination prior to any Scheduled Vesting Date(s), then any outstanding portion of the Award will become vested as of the end of the day immediately preceding the date of such Change of Control and payable as set forth in Section E.2 below. |
| **COMMITTEE DISCRETION:** | The Committee, or PNC Designated Person, may determine, in its sole discretion and prior to your Termination Date, that with respect to all or a |

-3-



specified portion of your then outstanding Award, the Award will not be forfeited, but the vesting requirements of the Award will be satisfied, and the Award will become payable on the Scheduled Vesting Date(s) (subject to the terms of this Agreement and any additional restrictions, terms or conditions the Committee, or PNC Designated Person, may determine, in its sole discretion) as though you remained employed by PNC through the Scheduled Vesting Date.

| C. | | **FORFEITURE** |
|---|---|---|
| **C.1** | **FORFEITURE UPON TERMINATION OF EMPLOYMENT:** | Except as otherwise provided in Section B above, if you cease to be an employee of PNC prior to the Scheduled Vesting Date, you will not have satisfied the vesting requirements and the outstanding portion of the Award will be forfeited and cancelled without payment of any consideration by PNC as of your Termination Date. Upon such forfeiture and cancellation, neither you nor your successors, heirs, assigns or legal representatives will have any further rights or interest in the Award under this Agreement. |
| **C.2.** | **FORFEITURE IN CONNECTION WITH DETRIMENTAL CONDUCT:** | To the extent that PNC (acting through a PNC Designated Person) determines in its sole discretion (a) that you have engaged in Detrimental Conduct prior to the Scheduled Vesting Date, and (b) to forfeit and cancel (without payment of any consideration by PNC) all or a specified portion of the outstanding Award as a result of such determination, then such portion will be forfeited and cancelled effective as of the date of such determination. |
| | | Upon such determination, neither you nor your successors, heirs, assigns or legal representatives will have any further rights or interest in the Award under this Agreement. |
| D. | | **DIVIDEND EQUIVALENTS** |
| **D.1** | **GENERALLY:** | As of the Award Effective Date, you will be entitled to earn cash Dividend Equivalents on outstanding RSUs in an amount equal to the amounts of the quarterly cash dividends, if any, you would have received had the RSUs to which such |



Dividend Equivalents relate been Shares issued and outstanding on the record dates.

| | | |
|---|---|---|
| **D.2** | **DETERMINATION OF DIVIDEND EQUIVALENTS:** | Dividend Equivalents apply to the period beginning on the Grant Date until such time as the RSUs to which such Dividend Equivalents relate either are paid out or are cancelled upon forfeiture, at which point such related Dividend Equivalents terminate. Dividend Equivalents, if any, are payable with respect to a dividend only if the RSUs to which such Dividend Equivalents relate are outstanding on the dividend record date for such dividend. |
| **D.3** | **QUARTERLY DIVIDEND EQUIVALENT PAYMENTS:** | As of the Award Effective Date, the Corporation will make Dividend Equivalents payments (where applicable) following the quarterly dividend payment date that relates to the applicable record date. Such amounts will be paid to you in cash, in accordance with PNC's regular payroll practice applicable to you, as soon as administratively practicable, but no later than 30 days after the applicable dividend payment date (and in any event, by December 31 of the year of such dividend payment date). No interest will be paid with respect to any such payments made pursuant to this Section D. |

| | | |
|---|---|---|
| **E.** | | **PAYMENT OF THE AWARD** |
| **E.1** | **PAYMENT GENERALLY:** | (a) <u>Timing Generally</u>. Except as otherwise provided below, vested RSUs that remain outstanding will be settled as soon as practicable following (i) the Scheduled Vesting Date (but no later than December 31st of the year the Scheduled Vesting Date occurs), or (ii) your date of death, if your date of death is prior to the Scheduled Vesting Date (but no later than December 31st of the year following the year the date of death occurs). |

(b) <u>Amount</u>. Upon vesting, RSUs will be settled at the time set forth in this Section E by payment to you of cash in an amount equal to the number of outstanding vested RSUs multiplied by the then current Fair Market Value of a share of Common Stock on the Scheduled Vesting Date less the payment of any applicable withholding taxes pursuant to Section 6 of <u>Appendix A</u>. No interest



will be paid with respect to any such payments made pursuant to this Section E.

| | | |
|---|---|---|
| E.2 | **TIMING OF PAYMENT UPON A CHANGE OF CONTROL:** | (a)  Where vesting occurs due to the occurrence of a Change of Control and such Change of Control is a permissible payment event under Section 409A of the Internal Revenue Code, payment of the vested Award will be made as soon as practicable after the Change of Control date (but in no event later than the March 15th following the year in which the Change of Control occurs). |
| | | (b)  Upon the occurrence of a Change of Control that is not a permissible payment event under Section 409A of the Internal Revenue Code, payment of the vested Award (without further Dividend Equivalents and without any reinvestment) will be made as soon as practicable following the original Scheduled Vesting Date defined in Section B.1.  In the event of your death following such Change of Control but prior to the payment date, payment will be made as soon as practicable following the first to occur of (x) the Scheduled Vesting Date and (y) your date of death (but in any event, no later than December 31st of the year following the year of your death). |
| F. | **RESTRICTIVE COVENANTS:** | Upon your acceptance of this Award, you shall become subject to the restrictive covenant provisions set forth in Section 1 of Appendix A. |
| G. | **CLAWBACK:** | The Award, and any right to receive and retain any Shares (if applicable), cash or other value pursuant to the Award, is subject to rescission, cancellation or recoupment, in whole or in part, if and to the extent so provided under the Corporation's Incentive Compensation Adjustment and Clawback Policy and Dodd-Frank Recoupment Policy, as in effect from time to time with respect to the Award, or any other applicable clawback, adjustment or similar policy in effect on or established by the Board or the Committee from time to time and to any clawback or recoupment that may be required by applicable law or regulation (each a "Clawback Policy," and together, the "Clawback Policies").  In the event of a clawback, recoupment or forfeiture event under an applicable Clawback Policy, the |



amount required to be clawed back, recouped or forfeited under such policy, shall be deemed not to have been earned under the terms of the Plan, and the Corporation is entitled to recover from you the amount specified under the Clawback Policy to be clawed back, recouped, or forfeited (which amount, as applicable, shall be deemed an advance that remained subject to your satisfaction of all eligibility conditions for earning the RSUs). The RSUs are not considered earned, and the eligibility requirements with respect to the RSUs are not considered met, until all requirements of the Plan, this Agreement, and any Clawback Policies are met.

By accepting this Award, you agree that you are obligated to provide all assistance necessary to the Corporation to recover or recoup the Shares, cash or other value pursuant to the Award which are subject to recovery or recoupment pursuant to applicable law, government regulation, stock exchange listing requirement or PNC policy, including the Clawback Policies. Such assistance shall include completing any documentation necessary to recover or recoup the Shares, cash or other value pursuant to the Award from any accounts you maintain with PNC or any pending or future compensation.

A copy of the Incentive Compensation Adjustment and Clawback Policy is included in the materials distributed to you with this Agreement. A copy of the Dodd-Frank Recoupment Policy is included as Exhibit 97 on the Corporation's Annual Report filed on Form 10-K.



**THE PNC FINANCIAL SERVICES GROUP, INC.**
**2016 INCENTIVE AWARD PLAN**

**CASH-PAYABLE RESTRICTED SHARE UNITS AWARD AGREEMENT**

**APPENDIX A**

**ADDITIONAL PROVISIONS**

1.     **Restrictive Covenants**.  You and PNC acknowledge and agree that you have received adequate consideration with respect to enforcement of the provisions of this Section 1 by virtue of accepting this Award (regardless of whether the Award or any portion thereof is ultimately settled and paid to you); that such provisions are reasonable and properly required for the adequate protection of the business of PNC and its subsidiaries; and that enforcement of such provisions will not prevent you from earning a living.

(a)     Non-Solicitation; No-Hire.  You agree to comply with the provisions of this Section 1(a) during the period of your employment with PNC and the 12-month period following your Termination Date, regardless of the reason for such termination of employment, as follows:

i.     *Non-Solicitation*.  You will not, directly or indirectly, either for your own benefit or purpose or for the benefit or purpose of any Person other than PNC, solicit, call on, do business with, or actively interfere with PNC's relationship with, or attempt to divert or entice away, any Person that you should reasonably know (A) is a customer of PNC for which PNC provides any services as of your Termination Date, or (B) was a customer of PNC for which PNC provided any services at any time during the 12 months preceding your Termination Date, or (C) was, as of your Termination Date, considering retention of PNC to provide any services.

ii.     *No-Hire*.  You will not, directly or indirectly, either for your own benefit or purpose or for the benefit or purpose of any Person other than PNC, employ or offer to employ, call on, or actively interfere with PNC's relationship with, or attempt to divert or entice away, any employee of PNC. You also will not assist any other Person in such activities.

Notwithstanding Section 1(a)(i) and Section 1(a)(ii) above, if your termination of employment with PNC is an Anticipatory Termination, then commencing immediately after your Termination Date, the provisions of Section 1(a)(i) and Section 1(a)(ii) will no longer apply and will be replaced with the following provision:

--1--



"No-Hire. You agree that you will not, for a period of one year after your Termination Date, employ or offer to employ, solicit, actively interfere with PNC's or any PNC affiliate's relationship with, or attempt to divert or entice away, any officer of PNC or any affiliate of PNC."

(b)    Confidentiality. During your employment with PNC and thereafter regardless of the reason for termination of such employment, you will not disclose or use in any way any confidential business or technical information or trade secret acquired in the course of such employment, all of which is the exclusive and valuable property of PNC whether or not conceived of or prepared by you, other than (i) information generally known in PNC's industry or acquired from public sources, (ii) as required in the course of employment by PNC, (iii) as required by any court, supervisory authority, administrative agency or applicable law, or (iv) with the prior written consent of PNC. Nothing in this Agreement, including this Section 1(b), is intended to limit you from affirmatively reporting to, communicating directly with, or providing information and documents — with the exception of information or documents that are subject to a legal or other applicable privilege—to any governmental entity, regulator, or self-regulatory organization (including the Securities and Exchange Commission or Commodity Futures Trading Commission) regarding possible violations of law or regulation. You further understand and agree that you are not required to contact or receive consent from PNC before engaging in such communications with any such authorities. However, if you receive a court order or valid and effective subpoena, interrogatory, or similar legal process not involving a governmental agency or regulatory body that requires disclosure of any confidential business or technical information or trade secret, before making any disclosure you must promptly notify PNC in writing of the order or other legal process.

(c)    Ownership of Inventions. You will promptly and fully disclose to PNC any and all inventions, discoveries, improvements, ideas or other works of inventorship or authorship, whether or not patentable, that have been or will be conceived and/or reduced to practice by you during the term of your employment with PNC, whether alone or with others, and that are (i) related directly or indirectly to the business or activities of PNC or (ii) developed with the use of any time, material, facilities or other resources of PNC ("Developments"). You agree to assign and hereby do assign to PNC or its designee all of your right, title and interest, including copyrights and patent rights, in and to all Developments. You will perform all actions and execute all instruments that PNC or any subsidiary will deem necessary to protect or record PNC's or its designee's interests in the Developments. The obligations of this Section 1(c) will be performed by you without further compensation and will continue beyond your Termination Date.

(d)    Enforcement Provisions. You understand and agree to the following provisions regarding enforcement of Section 1 of this Agreement:

    i.    Equitable Remedies. A breach of the provisions of Sections 1(a) – 1(c) will cause PNC irreparable harm, and PNC will therefore be entitled to seek issuance of immediate, as well as permanent, injunctive relief restraining you, and each and every person and entity acting in concert or participating with you, from initiation and/or continuation of such breach.



ii.    *Tolling Period*. If it becomes necessary or desirable for PNC to seek compliance with the provisions of Section 1(a) by legal proceedings, the period during which you will comply with said provisions will extend for a period of 12 months from the date PNC institutes legal proceedings for injunctive or other relief.

iii.    *Reform*. If any of Sections 1(a) – 1(c) are determined by a court of competent jurisdiction to be unenforceable because unreasonable either as to length of time or area to which the restriction applies, it is the intent of both parties that the court reduce and reform the restriction so as to apply the greatest limitations considered enforceable by the court.

iv.    *Waiver of Jury Trial*. Each of you and PNC hereby waives any right to trial by jury with regard to any suit, action or proceeding under or in connection with any of Sections 1(a) – 1(c).

v.    *Application of Defend Trade Secrets Act*. Regardless of any other provision in this Agreement, you may be entitled to immunity and protection from retaliation under the Defend Trade Secrets Act of 2016 for disclosing trade secrets under certain limited circumstances, as set forth in PNC's Defend Trade Secrets Act policy. The policy is available for viewing on PNC's intranet under the "PNC Ethics" page.

**2.    Capital Adjustments upon a Change of Control**. Upon the occurrence of a Change of Control, (a) the number, class and kind of RSUs then outstanding under the Award will automatically be adjusted to reflect the same changes as are made to outstanding shares of Common Stock generally, (b) the value per share unit of any share-denominated award amount will be measured by reference to the per share value of the consideration payable to a holder of Common Stock in connection with such Corporate Transaction or Transactions if applicable, and (c) with respect to stock-payable RSUs only, if the effect of the Corporate Transaction or Transactions on a holder of Common Stock is to convert that shareholder's holdings into consideration that does not consist solely (other than as to a minimal amount) of shares of Common Stock, then the entire value of any payment to be made to you will be made solely in cash at the applicable time specified in this Agreement.

**3.    Fractional Shares**. No fractional Shares will be delivered to you.

**4.    No Rights as a Shareholder**. You will have no rights as a shareholder of the Corporation by virtue of this Award unless and until Shares are issued and delivered in settlement of the Award pursuant to and in accordance with this Agreement.

**5.    Transfer Restrictions.**

(a)    The Award may not be sold, assigned, transferred, exchanged, pledged, or otherwise alienated or hypothecated.



(b)    If you are deceased at the time any outstanding vested RSUs are settled and paid out in accordance with the terms of this Agreement, such delivery of Shares, cash payment or other payment (as applicable) shall be made to the executor or administrator of your estate or to your other legal representative or, as permitted under the election procedures of the Plan's third-party administrator, to your designated beneficiary, in each case, as determined in good faith by the Corporation. Any delivery of Shares, cash payment or other payment made in good faith by the Corporation to your executor, other legal representative or permissible designated beneficiary, or retained by the Corporation for taxes pursuant to Section 6 of this Appendix A, shall extinguish all right to payment hereunder.

6.    **Withholding Taxes.**

(a)    You shall be solely responsible for any applicable taxes (including, without limitation, income and excise taxes), penalties and interest that you incur in connection hereunder. The Corporation will, at the time any withholding tax obligation arises in connection herewith, retain an amount sufficient to satisfy the minimum amount of taxes then required to be withheld by PNC in connection therewith from amounts then payable hereunder to you.

(b)    If any such withholding is required prior to the time amounts are payable to you hereunder or if such amounts are not sufficient to satisfy such obligation in full, the withholding will be taken from other compensation then payable to you or as otherwise determined by PNC.

(c)    The Corporation will withhold cash from any amounts then payable to you hereunder that are settled in cash. Unless the Committee or PNC Designated Person determines otherwise, with respect to stock-payable RSUs only, the Corporation will retain whole Shares from any amounts then payable to you hereunder (or pursuant to any other RSUs previously awarded to you under the Plan) in the form of Shares. For purposes of this Section 6(c), Shares retained to satisfy applicable withholding tax requirements will be valued at their Fair Market Value on the date the tax withholding obligation arises (as such date is determined by the Corporation).

7.    **Employment.** Neither the granting of the Award nor any payment with respect to such Award authorized hereunder nor any term or provision of this Agreement shall constitute or be evidence of any understanding, expressed or implied, on the part of PNC to employ you for any period or in any way alter your status as an employee at will.

8.    **Miscellaneous.**

(a)    Subject to the Plan and Interpretations. In all respects the Award and this Agreement are subject to the terms and conditions of the Plan, which has been made available to you and is incorporated herein by reference. The terms of the Plan will not be considered an enlargement of any benefits under this Agreement. If the Plan and this



Agreement conflict, the provisions of the Plan will govern. Interpretations of the Plan and this Agreement by the Committee are binding on you and PNC.

(b)    Governing Law and Jurisdiction. This Agreement is governed by and construed under the laws of the Commonwealth of Pennsylvania, without reference to its conflict of laws provisions. Any dispute or claim arising out of or relating to this Agreement or claim of breach hereof will be brought exclusively in the Federal court for the Western District of Pennsylvania or in the Court of Common Pleas of Allegheny County, Pennsylvania. By execution of this Agreement, you and PNC hereby consent to the exclusive jurisdiction of such courts and waive any right to challenge jurisdiction or venue in such courts with regard to any suit, action, or proceeding under or in connection with this Agreement.

(c)    Headings; Entire Agreement. Headings used in this Agreement are provided for reference and convenience only, are not considered part of this Agreement, and will not be employed in the construction of this Agreement. This Agreement, including any appendices or exhibits attached hereto, constitutes the entire agreement between you and PNC with respect to the subject matters addressed herein, and supersedes all other discussions, negotiations, correspondence, representations, understandings and agreements between the parties concerning the subject matters hereof.

(d)    Modification. Modifications or adjustments to the terms of this Agreement may be made by the Corporation as permitted in accordance with the Plan or as provided for in this Agreement. No other modification of the terms of this Agreement will be effective unless embodied in a separate, subsequent writing signed by you and by an authorized representative of the Corporation.

(e)    No Waiver. Failure of PNC to demand strict compliance with any of the terms, covenants or conditions of this Agreement will not be deemed a waiver of such term, covenant or condition, nor will any waiver or relinquishment of any such term, covenant or condition on any occasion or on multiple occasions be deemed a waiver or relinquishment of such term, covenant or condition.

(f)    Severability. The restrictions and obligations imposed by this Agreement are separate and severable, and it is the intent of both parties that if any restriction or obligation imposed by any of these provisions is deemed by a court of competent jurisdiction to be void for any reason whatsoever, the remaining provisions, restrictions and obligations will remain valid and binding upon you.

(g)    Applicable Laws. Notwithstanding anything in this Agreement, PNC will not be required to comply with any term, covenant or condition of this Agreement if and to the extent prohibited by law, including but not limited to Federal banking and securities regulations, or as otherwise directed by one or more regulatory agencies having jurisdiction over PNC.



(h)    <u>Compliance with Section 409A of the Internal Revenue Code</u>.  It is the intention of the parties that the Award and this Agreement comply with the provisions of Section 409A of the Internal Revenue Code to the extent, if any, that such provisions are applicable. This Agreement will be administered in a manner consistent with this intent, including as set forth in Section 20 of the Plan.  If the Award includes a "series of installment payments" (within the meaning of Section 1.409A-2(b)(2)(iii) of the Treasury Regulations), your right to the series of installment payments will be treated as a right to a series of separate payments and not as a right to a single payment.



**THE PNC FINANCIAL SERVICES GROUP, INC.**
**2016 INCENTIVE AWARD PLAN**

**CASH-PAYABLE RESTRICTED SHARE UNITS AWARD AGREEMENT**

## APPENDIX B

## DEFINITIONS

**Certain Definitions**. Except as otherwise provided, the following definitions apply for purposes of this Agreement.

"Anticipatory Termination" means a termination of employment where PNC terminates your employment with PNC (other than for Misconduct or Disability) prior to the date on which a Change of Control occurs, and you reasonably demonstrated that such termination of employment (i) was at the request of a third party that has taken steps reasonably calculated to effect a Change of Control or (ii) otherwise arose in connection with or in anticipation of a Change of Control.

"Award Effective Date" has the meaning set forth in Section A of this Agreement.

"Change of Control" means:

(a)     Any Person becomes the beneficial owner (within the meaning of Rule 13d-3 promulgated under the Exchange Act) of 20% or more of either (x) the then-outstanding shares of Common Stock (the "Outstanding PNC Common Stock") or (y) the combined voting power of the then-outstanding voting securities of the Corporation entitled to vote generally in the election of directors (the "Outstanding PNC Voting Securities"). The following acquisitions will not constitute a Change of Control for purposes of this definition:  (1) any acquisition directly from the Corporation, (2) any acquisition by the Corporation, (3) any acquisition by any employee benefit plan (or related trust) sponsored or maintained by the Corporation or any company controlled by, controlling or under common control with the Corporation (an "Affiliated Company"), (4) any acquisition pursuant to an Excluded Combination (as defined below) or (5) an acquisition of beneficial ownership representing between 20% and 40%, inclusive, of the Outstanding PNC Voting Securities or Outstanding PNC Common Stock if the Incumbent Board (as defined below) as of immediately prior to any such acquisition approves such acquisition either prior to or immediately after its occurrence;

(b)     Individuals who, as of the date hereof, constitute the Board (the "Incumbent Board") cease for any reason to constitute at least a majority of the Board (excluding any Board seat that is vacant or otherwise unoccupied). For purposes of this definition, any individual becoming a director subsequent to the date hereof whose election, or nomination for election by the shareholders of the Corporation, was approved by a vote of at least two-thirds of the directors then comprising the Incumbent Board will



be considered as though such individual was a member of the Incumbent Board, but excluding, for this purpose, any such individual whose initial assumption of office occurs as a result of an actual or threatened election contest with respect to the election or removal of directors or other actual or threatened solicitation of proxies or consents by or on behalf of a Person other than the Board;

(c)    Consummation of a reorganization, merger, statutory share exchange or consolidation or similar transaction involving the Corporation or any of its subsidiaries, a sale or other disposition of all or substantially all of the assets of the Corporation, or the acquisition of assets or stock of another entity by the Corporation or any of its subsidiaries (each, a "Business Combination"). A transaction otherwise meeting the definition of Business Combination will not be treated as a Change of Control if following completion of the transaction all or substantially all of the beneficial owners of the Outstanding PNC Common Stock and the Outstanding PNC Voting Securities immediately prior to such Business Combination beneficially own, directly or indirectly, more than 60% of the then-outstanding shares of Common Stock (or, for a non-corporate entity, equivalent securities) and the combined voting power of the then-outstanding voting securities entitled to vote generally in the election of directors (or, for a non-corporate entity, equivalent governing body), as the case may be, of the entity resulting from such Business Combination (including, without limitation, an entity that, as a result of such transaction, owns the Corporation or all or substantially all of the Corporation's assets either directly or through one or more subsidiaries) in substantially the same proportions as their ownership immediately prior to such Business Combination of the Outstanding PNC Common Stock and the Outstanding PNC Voting Securities, as the case may be (such a Business Combination, an "Excluded Combination"); or

(d)    Approval by the shareholders of the Corporation of a complete liquidation or dissolution of the Corporation.

"Competitive Activity" means any participation in, employment by, ownership of any equity interest exceeding one percent in, or promotion or organization of, any Person other than PNC (1) engaged in business activities in the Restricted Territory similar to some or all of the business activities of PNC during your employment or (2) engaged in business activities in the Restricted Territory that you know PNC intends to enter within the next 12 months (or, if after your Termination Date, within the first 12 months after your Termination Date), in either case whether you are acting as agent, consultant, independent contractor, employee, officer, director, investor, partner, shareholder, proprietor or in any other individual or representative capacity therein. For purposes of Competitive Activity as defined herein (and as such similar term is defined in any equity-based award agreement held by you), the term "subsidiary" will not include any company in which PNC holds an interest pursuant to its merchant banking authority.

"Detrimental Conduct" means:

(a)    You have engaged in, without the prior written consent of PNC (with consent to be given or withheld at PNC's sole discretion), in any Competitive Activity in



the Restricted Territory at any time during the period of your employment with PNC and the 12-month period following your Termination Date;

      (b)    any act of fraud, misappropriation, or embezzlement by you against PNC or one of its subsidiaries or any client or customer of PNC or one of its subsidiaries; or

      (c)    you are convicted (including a plea of guilty or of nolo contendere) of, or you enter into a pre-trial disposition with respect to, the commission of a felony that relates to or arises out of your employment or other service relationship with PNC.

      You will be deemed to have engaged in Detrimental Conduct for purposes of this Agreement only if and when the Committee or other PNC Designated Person determines that you have engaged in conduct described in clause (a) or clause (b) above or that an event described in clause (c) above has occurred with respect to you. Detrimental Conduct will not apply to conduct by or activities of successors to the Award by will or the laws of descent and distribution in the event of your death.

      No determination that you have engaged in Detrimental Conduct may be made (x) on or after your Termination Date if your termination of employment was an Anticipatory Termination or (y) between the time PNC enters into an agreement providing for a Change of Control and the time such agreement either terminates or results in a Change of Control.

"Displacement Benefit Plan Termination" means a termination of employment where you (i) meet the eligibility requirements and other terms and conditions and performance requirements of the PNC Financial Services Group, Inc. Displacement Benefit Plan, as amended and restated from time to time or any successor plan (the "Displacement Benefit Plan"), or would meet such requirements but for the fact that you are offered and enter into a Release as described in subsection (ii)(b) below and (ii) (a) execute and do not revoke a release of claims (a "Release") as required under the terms of the Displacement Benefit Plan, or (b) you are offered and have entered into a Release with PNC in lieu of or in addition to the Displacement Benefit Plan, as determined by the Committee or PNC Designated Person.

"Divestiture Termination" means a termination of employment, other than for Cause (as determined by a PNC Designated Person) or Misconduct, resulting from a business transaction (other than a Change of Control) involving the divestiture of a business unit of the Corporation (or an affiliate of the Corporation), whether through stock or asset sale or by reason of an outsourcing or similar transaction.

"Misconduct" means (a) your willful and continued failure to substantially perform your duties with PNC (other than any such failure resulting from incapacity due to physical or mental illness), after a written demand for substantial performance is delivered to you by the Board or the CEO that specifically identifies the manner in which the Board or the CEO believes that you have not substantially performed your duties; or (b) your willful engagement in illegal conduct or gross misconduct that is materially and demonstrably



injurious to PNC or any of its subsidiaries. For purposes of clauses (a) and (b), no act or failure to act, on your part, shall be considered willful unless it is done, or omitted to be done, by you in bad faith and without reasonable belief that your action or omission was in the best interests of PNC. Any act, or failure to act, based upon the instructions or prior approval of the Board, the CEO or your superior or based upon the advice of counsel for PNC, will be conclusively presumed to be done, or omitted to be done, by you in good faith and in the best interests of PNC.

Your cessation of employment will be deemed to be a termination of your employment with PNC for Misconduct only if and when there shall have been delivered to you, as part of the notice of your termination, a copy of a resolution duly adopted by the affirmative vote of not less than a majority of the entire membership of the Board, at a Board meeting called and held for the purpose of considering such termination, finding on the basis of clear and convincing evidence that, in the good faith opinion of the Board, you are guilty of conduct described in clause (a) or clause (b) above and, in either case, specifying the particulars thereof in detail. Such resolution shall be adopted only after (i) reasonable notice of such Board meeting is provided to you, together with written notice that PNC believes that you are guilty of conduct described in clause (a) or clause (b) above and, in either case, specifying the particulars thereof in detail, and (ii) you are given an opportunity, together with counsel, to be heard before the Board.

"Person" means any individual, entity or group (within the meaning of Section 13(d)(3) or 14(d)(2) of the Exchange Act).

"PNC Designated Person" for purposes of this Agreement means either the Committee, the CEO, the Chief Human Resources Officer of the Corporation, any executive officer of the Corporation or any other individual or group as may be designated by one of the foregoing to act as PNC Designated Person. If you are (or were when you ceased to be an employee of PNC) either a Group 1 covered employee (Corporate Executive Group member) including any equivalent successor classification or subject to the reporting requirements of Section 16(a) of the Exchange Act with respect to the Corporation's securities (or both), the PNC Designated Person is the Committee or its delegate.

"Restricted Territory" means (a) if you are employed by (or, if you are not an employee, providing the majority of your services to) PNC in the United States or Canada as of the Termination Date, the United States and Canada, (b) if you are employed by (or, if you are not an employee, providing the majority of your services to) PNC in the United Kingdom as of the Termination Date, the United Kingdom or (c) if you are employed by (or, if you are not an employee, providing the majority of your services to) PNC in Germany as of the Termination Date, Germany or the United Kingdom.

"Retirement" means your termination of employment with PNC at any time for any reason (other than termination of employment by reason of your death, by PNC for Cause or by reason of termination of employment in connection with a divestiture of assets or a divestiture of one or more subsidiaries of PNC if the Committee or the CEO or his or her designee so determines prior to such divestiture) on or after the first date on which you



have both attained at least age 55) and completed five years of service, where a year of service is determined in the same manner as the determination of a year of vesting service calculated under the provisions of The PNC Financial Services Group, Inc. Pension Plan.

"Termination Date" means the last day of your employment with PNC. If you are employed by a Subsidiary that ceases to be a Subsidiary or ceases to be a consolidated subsidiary of the Corporation under U.S. generally accepted accounting principles and you do not continue to be employed by or otherwise have a Service Relationship with PNC, then for purposes of this Agreement, your employment with PNC terminates effective at the time this occurs.



### THE PNC FINANCIAL SERVICES GROUP, INC.
### 2016 INCENTIVE AWARD PLAN

### RESTRICTED SHARE UNITS AWARD AGREEMENT

### <u>ADDENDUM FOR CALIFORNIA EMPLOYEES</u>

1.    DEFINITION.  As used in this Addendum, "California Employee" means an individual who is or was an Employee of PNC who is a resident of or whose primary place of work is in the State of California.  This Addendum shall apply only to a California Employee, and this Addendum shall not apply to any Awards made under the Plan to any other person.

2.    INTERACTION WITH THE AGREEMENT.

(a)    Article C.2 Forfeiture in Connection with Detrimental Conduct.  Article C.2 shall not apply to California Employees to the extent a California Employee engages in conduct described in clause (a) of the definition of "<u>Detrimental Conduct</u>."  Article C.2 shall apply to the extent a California Employee engages in conduct described in clause (b) or clause (c) of the same definition.

(b)    Article G and the Incentive Compensation Adjustment and Clawback Policy ("Clawback Policy").  No adjustment to or deductions from a California Employee's earned compensation will occur as a result of the Clawback Policy unless otherwise required by federal law or regulations or allowed by California law.

(c)    <u>Appendix A</u>, Article 1 "Restrictive Covenants", shall be modified as follows:

      (i).    Subsection (a) shall not apply to California Employees.

      (ii).    Subsection (c) "*Ownership of Inventions*" – pursuant to California Labor Code Section 2872, the Agreement does not apply to any Intellectual Property of the Employee which qualifies for the protections of California Labor Code Section 2870, a copy of which is attached.  California Employees agree to promptly advise PNC in writing of any invention or Development that they believe to meet the criteria of California Labor Code Section 2870 that they have not otherwise already disclosed.

      (iii).    Subsection (d)(4) "*Waiver of Jury Trial*" – shall not apply to California Employees.

(d)    California Employees remain bound by the remaining Restrictive Covenants in Appendix A, Section 1 to the extent allowed by California law.

(e)    This Addendum should be read in conjunction with the Agreement and is subject to the terms and conditions of the Agreement except to the extent that the terms and conditions of the Agreement differ from or conflict with the terms set out in this Addendum, in which event, the terms set out in this Addendum shall prevail.

(f)    You and the Corporation agree that this Addendum shall apply to all Awards to California Employees, including prior Awards which have yet to vest, to the extent allowed by law.

3.    GENERAL.  The terms and conditions provided in this Addendum are severable and if any one or more provisions (or the effect of any such provision) are determined to



be subject to any laws of the State of California and to be illegal or otherwise unenforceable under such laws, in whole or in part, the remaining provisions shall nevertheless be binding and enforceable.



**THE PNC FINANCIAL SERVICES GROUP, INC.**
**2016 INCENTIVE AWARD PLAN**

**RESTRICTED SHARE UNITS AWARD AGREEMENT**

**<u>ADDENDUM FOR WASHINGTON EMPLOYEES</u>**

1. DEFINITION. As used in this Addendum, "Washington Employee" means an individual who is or was an employee of PNC and working in the State of Washington. This Addendum shall apply only to a Washington Employee, and this Addendum shall not apply to any Awards made under the Plan to any other person.

2. INTERACTION WITH THE AGREEMENT.
   a. Section 8(b) of the Agreement shall be modified as follows:

      "<u>Governing Law and Jurisdiction</u>. This Agreement is governed by and construed under the laws of the State of Washington, without reference to its conflict of law's provisions."

   b. <u>Appendix A</u>, Article 1(a)(i) of "Restrictive Covenants," shall be modified as follows:

      "(i).        *Non-Solicitation.* You will not, directly or indirectly, either for your own benefit or purpose or for the benefit or purpose of any Person other than PNC, solicit, call on, or actively interfere with PNC's relationship with, or attempt to divert or entice away, any Person that is a current customer of PNC."

   c. Washington Employees remain bound by the remaining Restrictive Covenants in Appendix A, Section 1 to the extent allowed by Washington law.

   d. This Addendum should be read in conjunction with the Agreement and is subject to the terms and conditions of the Agreement except to the extent that the terms and conditions of the Agreement differ from or conflict with the terms set out in this Addendum, in which event, the terms set out in this Addendum shall prevail.

   e. You and the Corporation agree that this Addendum shall apply to all Awards to Washington Employees granted on or after June 6, 2024, and which have yet to vest, to the extent allowed by law.

3. GENERAL. The terms and conditions provided in this Addendum are severable and if any one or more provisions (or the effect of any such provision) are determined to be subject to any laws of the State of Washington and to be illegal or otherwise unenforceable under such laws, in whole or in part, the remaining provisions shall nevertheless be binding and enforceable.



IN WITNESS WHEREOF, the Corporation has caused this Agreement to be signed on its behalf as of the Grant Date.

THE PNC FINANCIAL SERVICES GROUP, INC.

By:

*William S Demchak*

**Chief Executive Officer**

ATTEST:

By:

**Corporate Secretary**

ACCEPTED AND AGREED TO by GRANTEE

_____
**Grantee**

```
PE8DSUW3
05/12/2025 11:18 PM U.S. Eastern Standard Time
ACCEPTED
```